EUGENIA C. MATHEWS *vs.* J. M. SHEEHAN ET AL., AD-
MINISTRATORS.

First Judicial District, Hartford, March Term, 1904.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

It is the duty of an administrator to close up a speculative margin
account in stocks, opened by the decedent, within a reasonable
time after his death; and for a breach of this duty, resulting in
losses, he is personally liable to the heirs at law or distrib-
utees who do not consent to the continuance of the specula-
tion.

The mere fact that in continuing the account the personal representa-
tive acts in good faith for the benefit of the estate, and with ordi-
nary care and prudence, is immaterial, inasmuch as the law forbids
him either to enter upon or continue in such a hazardous under-
taking.

A finding by a committee, to the effect that charges made by adminis-
trators for their services were reasonable and proper, is sufficient,
without detailing the evidence upon which it rests.

The taxation of costs, upon an appeal from probate, is a matter within
the discretion of the Superior Court.

Argued March 1st—decided April 15th, 1904.

APPEAL from an order and decree of the Court of Pro-
bate for the district of Stafford relating to certain adminis-
tration accounts, taken to the Superior Court in Tolland
County and referred to a committee by whom the facts were
found and reported; the court, *Shumway, J.,* accepted the
committee's report, overruling a remonstrance thereto, and
judgment was afterwards rendered (*Robinson, J.*) in favor
of the defendants, from which the plaintiff appealed. *Error,
judgment set aside and cause remanded.*

Julius Converse died intestate June 7th, 1892, leaving a
widow, Mira L. Converse, and four children, namely, Eugenia
C. Mathews, Lillia A. Lee, J. Carl Converse and Louis S.
Converse. Alvarado Howard and J. M. Sheehan were ap-
pointed and qualified as administrators of the estate of the
deceased, and one year from June 16th, 1892, was fixed for
the settlement of the estate.

This case, in another aspect of it, was before this court in *Mathews' Appeal*, 72 Conn. 555. After the decision of this court in that case, the Superior Court proceeded to settle the final account of the administrators of said estate, and as one step in that business it appointed a committee to hear the evidence and report the facts to the court. To the report made by that committee Mrs. Mathews filed a remonstrance, the substance of which is stated in the opinion. To the separate grounds of the remonstrance the administrators demurred on divers grounds. The court sustained the demurrer and subsequently overruled the remonstrance, accepted the report, and rendered judgment in accordance with the facts therein found.

*Edward D. Robbins*, for the appellant (plaintiff).

*Charles E. Perkins*, for the appellees (defendants).

TORRANCE, C. J. When Mr. Converse died he was indebted to certain stock-brokers in the sum of a little over $286,000, " on margin account," secured by stocks and bonds purchased for him by such brokers and carried by them for him " upon the usual terms on which speculative accounts are carried " by brokers.

The appellant claims that the administrators, instead of settling these speculative accounts within a reasonable time, carried some of them along for an unreasonable time and for the purpose of speculative gains, and thereby caused loss to her as one of the heirs of the intestate, and that they are accountable to her therefor.

The committee has found that the course pursued by the administrators with respect to these accounts was one " which ordinary business men would have taken under similar circumstances," and that in pursuing it they acted in good faith and with due care and prudence.

Upon this finding the court held that the administrators were not accountable to the appellant for any losses that may have resulted to her from what they did with these specula-

tive accounts; and the main question in the case is whether the court erred in so holding.

In substance, the report shows the following facts bearing upon this question: At the time of his death Mr. Converse had speculative accounts with the following stock-brokers, namely, Howard Lapsley and Company, Clark, Dodge and Company, Cordley and Company, and Samuel W. Boocock. For brevity these accounts will be called the Howard account, the Clark account, the Cordley account, and the Boocock account, respectively. The understanding between Mr. Converse and these brokers was the usual one in such cases: that the securities carried by them should at all times have a value exceeding the balance due upon his account by a margin of at least ten per cent. of the par value of such securities; and that if Mr. Converse did not furnish such margin, when required to do so, the broker had the right to sell such securities upon the stock exchange, so far as might be necessary for the broker's protection. On July 1st, 1892, there was due from the estate upon these four accounts the following sums (omitting the cents) namely: on the Howard account $44,610; on the Clark account $148,324; on the Cordley account $75,895; and on the Boocock account $15,275. In the inventory the administrators entered the net value of the securities held by the brokers for this indebtedness as "cash with bankers and brokers, $45,000," that amount being their estimate of what might be realized from a sale of these securities above the indebtedness due on the several accounts. The administrators permitted all of the securities to remain in the hands of the brokers, but made no arrangements with them as to the terms on which the accounts should be carried for the estate, other than the arrangement which Mr. Converse had with them as hereinbefore stated, with the exception of an arrangement made with Cordley and Company in July, 1893, as hereinafter stated. No advances were made to any of the brokers by the administrators to restore reduced margins, although in a few instances they were called upon to do so. If the margins were impaired by reason of the reduction in the market value of the

collateral, they were restored to the amount required for the proper security of the account, either by a sale of the stocks, or by a transfer by the administrators of stocks from the other brokers whose accounts showed a margin above what was required, the broker receiving the stock holding it as additional security for the money advanced. The interest on the balance due to the several brokers was adjusted in the accounts, and no money was ever advanced to the brokers by the administrators on account of this item, nor for any other purpose. The administrators bought no new stocks, and their transactions related wholly to the stocks belonging to the estate of Mr. Converse in the hands of said brokers at the time of his death. The Boocock account was closed out in August, 1892, by a sale of the securities held by him, leaving a balance due the estate of $6,620.52; which was paid to the administrators and duly credited in their account. By February, 1893, the Cordley account had been reduced by sales or transfers of the securities to $20,062.50; and on the 20th of that month, by order of the administrators, Howard Lapsley and Company paid that indebtedness and took by transfer the securities then remaining in the hands of Cordley and Company, thus closing the Cordley account. In July, 1893, by sales of securities from time to time, the Clark account had been reduced to $34,000.22, secured by certain stocks; and on July 5th, 1893, by order of the administrators, these stocks were transferred to Cordley and Company who then assumed the indebtedness to Clark, Dodge and Company, whose account was thus closed. On July 27th, 1893, the Howard account had been reduced to $25,594.61, secured by stocks; and on that day, by direction of the administrators, Cordley and Company paid that balance to Howard Lapsley and Company and took a transfer of the securities held by the latter, and this closed the Howard account. On August 1st, 1893, under this new account with Cordley and Company, the balance due to them from the estate was $10,070.43 secured by certain stocks in their hands. Subsequently, by sales of these securities made in November, 1895, and in May, 1896, the indebtedness to

this firm was reduced to $2,610.38. To secure this balance there was left 500 shares of the common stock, and 150 shares of the preferred stock, of the Buffalo, Rochester & Pittsburg Railroad Co. No further sales of the stock were made, and on June 24th, 1897, Cordley and Company became insolvent, and their estate is being wound up under the insolvent laws of Massachusetts. It is not probable that anything will ever be paid on this account. Cordley and Company, in order to secure their own private debts, either sold or pledged the stock in their hands belonging to the estate, being the 500 shares of Buffalo, Rochester & Pittsburg common stock, and 150 shares of the preferred stock of the same company, and at the time of the failure they held none of these shares. The new account was opened with Cordley and Company with the agreement that the interest charge on balances should be at the rate of six per cent., and that it should not be considered or treated as a speculative account. Subsequently the accounts were rendered to the administrators in the form usually adopted in speculative accounts, but the administrators were not called upon for any money to increase or to restore the margins. In June, 1893, there was a financial panic, and the stock-market became unsettled and irregular, and there was little opportunity of disposing of the stocks at fair prices. Some time afterwards Clark, Dodge and Company and Howard Lapsley and Company each demanded twelve per cent. interest on the balance due to them from the estate for carrying the stocks then in their hands. The administrators refused to comply with this demand, and made an agreement with Cordley and Company to open a new account with them on August 1st, 1893, the rate of interest on balances to be six per cent. Under this agreement the stocks in the hands of the two firms were transferred to Cordley and Company, as hereinbefore stated.

Between July 1st, 1892, and February 1st, 1893, "many attempts were made by the administrators and the heirs to divide the property and settle the estate, by some agreement which should cover all of the property, including the

brokers' accounts. No agreement was reached at this time, and with the approval of the widow and all of the heirs, except Mrs. Mathews, who did not participate in these attempts at settlement, the brokers' accounts were permitted to remain as they then were, in the expectation that such an agreement would be accomplished. It did not appear that Mrs. Mathews either approved or disapproved of this arrangement."

It is further found, in substance, that between the dates last mentioned all of the securities held by the four brokers had a current market value, varying somewhat from time to time; that many of said securities were, during that time, sold at current market prices; that with reasonable effort all of them could have been so sold; but that the "administrators in the exercise of their best judgment, and with the approbation of the widow and the three heirs living in Connecticut, decided that it was not for the best interest of the estate to place all of said stocks on the market at that time and force their sale, but thought it best to hold them for better prices or for a distribution to the widow and heirs, as hereinbefore stated." It is further found that in this matter the administrators acted in good faith, in the exercise of their best judgment, upon the best advice and counsel obtainable.

These are in substance the controlling facts found upon this part of the case. From them it appears that one of the four speculative accounts, Boocock's, was settled in August, 1892; that the Cordley account was settled in February, 1893, by transfer to the Howard account; that the Howard and Clark accounts were settled in July, 1893, by transfer to Cordley and Company; that the new Cordley account thus opened continued down to the time of the insolvency of that company in June, 1897; and that these accounts of Howard, Clark, and Cordley, might have been settled, without loss of other than speculative gains, within a reasonable time after July 1st, 1892, just as the Boocock account was.

Upon the facts found, the question arises whether the administrators are accountable for any losses that may have

occurred from the course pursued with reference to these last named speculative accounts. The answer to this question depends upon the answer to two other questions: (1) what was the duty of the administrators with reference to these accounts; and (2) did they perform that duty?

The securities held by the brokers when Mr. Converse died, were clearly a part of his estate, subject to the claims of the brokers. All the property of the estate, including these securities, was in a certain sense a trust fund in the hands of the administrators. *Robbins* v. *Coffing*, 52 Conn. 118, 144. By the 1st of July, 1892, the administrators had full knowledge that a part of that fund, which they inventoried at $45,000, was subject to the great hazards of the business of stock speculation. In these circumstances it was clearly their duty not to carry the speculative accounts for speculative gains, but to settle those accounts in a reasonable time, and thereby withdraw the securities from the perilous business in which they found them pledged. An administrator, or an executor, in the absence of authority therefor, is not permitted to use any part of the estate in trade, or manufacturing, or stock speculation, or other business venture, whereby the trust fund is put at hazard; and the doing by them of any of these things has generally been regarded as a breach of trust, rendering them personally liable for resulting losses, while incapable of sharing in accruing gains. *King* v. *Talbot*, 40 N. Y. 76; *Warren* v. *Union Bank*, 157 id. 259, 268; *Ward* v. *Tinkham*, 65 Mich. 695, 698; *Mattocks* v. *Moulton*, 84 Me. 545; *Lucht* v. *Behrens*, 28 Ohio St. 231, 238; *Alsop* v. *Mather*, 8 Conn. 584, 587; *Hallock* v. *Smith*, 50 id. 127; *Guthrie* v. *Wheeler*, 51 id. 207, 214.

As the law imposed upon the administrators the duty of settling the speculative accounts in a reasonable time, the next question is whether they performed that duty. That is largely a question of fact, and we think the clear import of the finding is that they did not, but that they carried these accounts along as speculative accounts, for speculative purposes, in

the hope of gains purely speculative and problematical. After July 1st, 1892, these accounts were carried along in the name of the estate very much as they had been carried during the life time of Mr. Converse, except that no new stocks were purchased. It is true, also, that the administrators advanced no money upon these accounts either for margin or interest; but it is equally true that whatever the brokers required by way of margin or interest was in some way furnished and paid, and ultimately came out of the estate. The committee has found, in effect, (1) that at all times between July 1st, 1892, and February 1st, 1893, the securities held by the brokers had a current market value that varied but little, from time to time, from the value they held in July, 1892; (2) that with reasonable effort they could have been disposed of at any time during that period, with advantage to the estate; and (3) that they probably would have been disposed of within some reasonable time during that period, but for the fact that the administrators, with the consent and approbation of the widow and the three heirs living in Connecticut, " thought it best to hold them for better prices or for distribution to the widow and heirs." We think that this part of the report must be treated as finding that the administrators did not settle or attempt to settle three of the speculative accounts within a reasonable time after July 1st, 1892, as they might and should have done, but that they carried them along as speculative accounts subject to all the hazards of stock speculation. In doing so they clearly deviated from the strict line of their duty. The committee has found, in effect, that, in doing this, they acted in good faith for the benefit of the estate, and with ordinary care and prudence. Be it so. This finding can only mean that they conducted the business of stock speculation in good faith and with ordinary care and prudence. But the law forbade them to enter upon or to continue in that business, and when charged with disobeying the law it is no answer to say that the forbidden thing was done in good faith and with ordinary care and prudence.

For loss resulting from this breach of duty the administrators are accountable to the widow and heirs, unless the acts which

caused the loss were done with the consent and allowance of the widow and heirs; and whether these acts were so done is next to be considered.

Where an administrator or an executor, acting in good faith and with ordinary care and prudence for the good of the beneficiaries of the estate, deviates, with their consent and approbation, from the strict line of his duty, and loss results therefrom—as for instance by continuing the property in business without authority—the consenting beneficiaries cannot charge the representative of the estate with such loss. *Poole* v. *Munday*, 103 Mass. 174; *Duffield* v. *Brainerd*, 45 Conn. 424. The committee has found, in effect, that what the administrators did with these speculative accounts, from first to last, they did with the full knowledge, consent, approbation and allowance of the widow and the three heirs who resided in Connecticut; and of this finding no one complains, and those whom it most affects appear to be entirely satisfied with the conduct to which they consented. But during the settlement of the estate Mrs. Mathews lived in Chicago, and with reference to her consent the finding is not as clear and explicit as it is with respect to the consent of the widow and the other heirs. Upon that point the facts found are these, in substance: In July, 1892, she knew of the situation in regard to these accounts. She was then in this State and present at some conferences between the administrators and the widow and heirs, at which were discussed plans for distributing among the heirs such securities in the brokers' hands as might remain after the debts due to the brokers had been paid. No agreement as to this matter was then reached, but Mrs. Mathews then told the administrators that she would enter into any arrangement to which the others would consent. In December, 1892, and in January, 1893, Mrs. Mathews, and her husband, who acted as her agent in this matter, were in this State and had interviews with the administrators. The husband suggested that the estate should be closed; he told the administrators that it would be unwise to continue the stock accounts; that he thought the stocks could have been sold out in November, 1892; and said that

while he did not want the stocks to be slaughtered, it was desirable to have the estate settled as speedily as possible. " A general scheme for the distribution of all the property, including an adjustment of the stock accounts, was considered at this time, and presented to the parties interested, including the appellant and her husband ; " but it was not completed, because, though approved by the appellant, it failed to get the approval of the other parties.   Previous to this Mrs. Mathews had expressed to the administrators a wish to obtain her share of the estate as soon as possible ; and was " anxious at all times after this that the stocks should be sold and the estate settled, and of this the administrators had notice."   Subsequently, in April, 1893, Mr. Mathews expressed his regret to one of the administrators that the stocks had not been sold.   In April, 1893, the widow and heirs, including Mrs. Mathews, entered into a written agreement for a mutual distribution of most of the estate (except the stocks in the hands of brokers) as provided by statute.   It was filed in the Court of Probate in June, 1893, and the property embraced in it was turned over to the parties entitled to it as of July 1st, 1893.   Subsequently, in 1895 and 1896, efforts were made from time to time by the administrators to settle with and turn over to Mrs. Mathews her remaining share of the estate, but it was never done. There are no other facts found having any material bearing upon the point now in question.

The committee has not found specifically that Mrs. Mathews did or did not consent to the course pursued by the administrators with the speculative accounts ; but we think the fair import of the report upon this point is, that up to the first of February, 1893, she did consent, as the others did, to the acts of the administrators with reference to the speculative accounts; and that the finding must be so construed.   It follows from this, that for losses to the appellant, if any, resulting from continuing the speculative accounts up to the end of January, 1893, the administrators are not accountable to her ; but that for losses so resulting after that time they are accountable.

The committee has thus found, in effect, that the administrators, in violation of their duty and against the expressed wish of the appellant, continued to carry the speculative accounts as such after January, 1893. It has also found, in effect, that for any loss resulting to her after that time, from the course thus taken by the administrators, they are not accountable, because they acted with ordinary care and prudence and in good faith. This last finding states a conclusion of law rather than one of fact; and it is a conclusion not warranted by the law as applied to the facts found; it is an erroneous conclusion. The appellant remonstrated against the acceptance of the report on account of this erroneous conclusion of the committee, and to this ground of remonstrance the administrators demurred. The court below sustained the demurrer upon this point, accepted the report, and rendered judgment thereon. In so doing we think the court erred, and that for this reason the judgment must be set aside.

In the view we take of this case the other grounds of remonstrance either become of no importance or require but a brief consideration.

The second ground, founded upon the alleged failure of the committee to find definitely the market value of the speculative accounts at a certain time, becomes of no importance in view of the fact that there must be a further hearing and finding in the case. This is true also of the third ground of remonstrance, based upon certain alleged inaccuracies in the report.

The fourth ground of remonstrance alleges, in effect, that the committee has not found the facts upon which it bases its finding that the charges made by the administrators for their services were reasonable and proper. The committee has found the fact itself, and that is sufficent in the absence of anything to show that it committed an error of law in so doing. It was not obliged, nor would it have been proper, to report the evidence on which its finding was based. Under the circumstances disclosed by the record we think the payments made by the administrators to the widow and

J. Carl Converse, to which exception is taken in the fifth and sixth grounds of remonstrance, were by the committee properly credited to the administrators.

In the sixth ground of remonstrance the appellant also excepts to certain interest charges paid to brokers, for which the committee allowed the administrators credit. In the further disposition of this case to be made as herein-after stated, this ground of remonstrance becomes unimportant. This disposes of all the grounds of remonstrance.

The appellant in the court below claimed that the administrators should not be allowed their costs in that court, but that costs should be taxed against them personally. The court overruled this claim and allowed the administrators their costs. As the judgment below must be reversed on other grounds, this ruling falls with it and can do the appellant no harm. It should be noted, however, that in cases like the present the allowance of costs is a matter within the discretion of the Superior Court. *Smith* v. *Scofield*, 19 Conn. 534; *Canfield* v. *Bostwick*, 22 id. 270; *Adams' Appeal*, 38 id. 304.

We think that the report as it now stands should be supplemented by a further finding, after a proper hearing, upon these two grounds: (1) Whether after January 31st, 1893, any loss resulted to the appellant, as an heir, to her portion of the estate, from the cause thereafter pursued by the administrators in dealing with the speculative accounts; and (2) the extent of that loss, if any; and that the report of the committee as modified by such supplemental finding should stand.

There is error, the judgment appealed from is set aside and the cause remanded to be proceeded with according to law.

In this opinion the other judges concurred.