Martha A. Peck et als. *vs.* F. A. Searle, Receiver
of Commercial Trust Company.

Maltbie, C. J., Haines, Hinman, Banks and Avery, Js.

Argued October 5th—decided November 7th, 1933.

*Bernard F. Gaffney* and *Donald Gaffney,* for the appellant (defendant).

*Roger W. Davis,* for the appellees (plaintiffs).

HAINES, J. The plaintiffs are the widow and three daughters, beneficiaries under the will of John J. Kimmel of Plainville, who died August 4th, 1930. The will named The Commercial Trust Company of New Britain as executor and trustee, "to hold, manage, invest and reinvest" the residuary estate and pay the income to the widow during her life, also to pay her $1000 a year from the principal of the estate if she wished it and as much more as in the judgment of the trustee was necessary for her ease, comfort and support, and upon her death the estate remaining to be divided between the three daughters as directed by the will. The estate was closed by the executor in October, 1931, and the residuary estate passed into the hands of the trustee.

These plaintiffs sought the removal of the trustee and on June 30th, 1932, the Court of Probate denied their petition therefor, but upon appeal to the Superior Court the judgment of the Court of Probate was reversed on the ground that it had abused its discretion in failing to remove the trustee under the terms of General Statutes, § 4962. The defendant's appeal from this decree presents the issues thus raised for consideration of this court.

A summary of the facts found by the trial court is to the effect that before his death the testator had pledged shares of The Associated Gas & Electric Company, The Hartford Electric Light Company and North American Company, with The Plainville Trust Company as part security for a note for $4500 signed by James R. Boswell and held by that company. There is no finding as to what the relations of the testator and Boswell were—whether they had a common interest in this note or whether the securities pledged by the testator in the nature of a loan, were for the benefit of Boswell himself.

The testator at the time of his death was also maintaining a margin account with each of two brokerage firms, Sanford-Eldredge & Company and Johnson & Company. To the former he owed $7973.60, secured by shares of The Saranac River Power Corporation and The Aetna Life Insurance Company. He owed Johnson & Company $3483.25, secured by shares of The Electric Bond and Share Company, The New York-Hamburg Company and The Rossia Insurance Company.

His entire net estate was inventoried by the executor and appraised at $91,210.51, of which $81,515.51 was in checks, bank accounts and securities. This was the situation when the executor took charge of the estate in August, 1930.

Upon petition and by authorization of the Court of Probate, the executor, on or about December 1st, 1930, paid the margin account to Sanford-Eldredge & Company, obtaining funds therefor by borrowing $7930.35 from The Plainville Trust Company and pledging as security therefor shares of The Aetna Life Insurance Company and The Colt Patent Fire Arms Company.

While thus administering the estate as executor, The Commercial Trust Company, on December 22d, 1930,

was placed in receivership and F. A. Searle was appointed receiver by the Superior Court, and on January 2d, 1931, that court authorized him as such, to continue pending matters in the trust department of that company, including by name the estate of John J. Kimmel, and by further order on January 23d, 1931, authorized the receiver to continue the management of the trust estates then in the hands of the Trust Company.

The executor petitioned the Court of Probate for permission to continue the pledge of the securities held as collateral for the Boswell note from February 1st, 1931, to August 1st, 1931, and on January 19th, 1931, that court found it would be inadvisable to sell those securities at their then market value and authorized the executor to pledge shares of The Hartford Electric Light Company, The Associated Gas & Electric Company and North American common stock with such additional securities as might be needed to continue the loan to August 1st, 1931. When that date arrived it was found that Boswell had not paid either the note or the interest thereon and the Court of Probate authorized the executor to permit Boswell to make a new note for the total amount of $4158 maturing February 1st, 1932, the executor to pledge such additional securities as were necessary to secure the renewal of the loan to that date. On February 1st, 1932, Boswell was out of the State and when the matter was brought to its attention by the then trustee, the Court of Probate found that the market value of securities held for the Boswell note, was then such that it would be inadvisable to close them out by a sale and therefore authorized the trustee to make a note in its own name as trustee for the temporary renewal of the note for three months with necessary collateral. The trustee thereupon procured a transfer of Boswell's securities to

its own name as trustee and made a new note. Upon the return of Boswell in July, 1932, this note for $4158 given by the trustee was canceled and surrendered and Boswell gave a renewal note for that amount. This Boswell note had not been paid to the date of the petition in this action.

On April 6th, 1931, the Court of Probate, upon the executor's petition, authorized it to borrow $14,000 from The New Britain Trust Company for six months and to pledge shares of The Hartford Fire Insurance Company and of North American as collateral security, to enable the executor to pay the margin account to Johnson & Company, and the loan by which it had paid the Sanford-Eldredge account, together with certain expenses for administration covering the inheritance tax, and the executor's and probate fees. The total obligations thus paid amounted to $14,790.47. This $14,000 note outstanding, appeared in the final account filed by the executor in the Court of Probate which was accepted October 1st, 1931, after notice. On October 2d, 1931, the trustee, who had then taken charge of the estate, renewed the note for six months and this note remained unpaid at the date of the petition.

From the time the estate came into the hands of the executor to the date of the probate hearing upon the petition for the removal of the trustee, the general market for securities steadily fell and the market price of the securities in this estate was abnormally depressed.

All the foregoing acts as executor and as trustee were done with the specific approval of the Court of Probate, and in most of the decrees touching the renewal of loans and pledging of securities the court found specifically that it was inadvisable in the interest

of the estate to sell the securities at the then depressed prices.

The certified evidence and the probate files in evidence require the addition to the finding that the petitioners had notice of the hearing on the preliminary account filed by the executor and approved March 16th, 1931, and also of the final account approved October 1st, 1931. It is found that while one of the petitioners did not attend the hearing, the widow was given a copy of the account. Nine days later the executor corrected one item in the inventory attached to this final account and this was accepted by the Court of Probate without formal notice. This final account of the executor showed that stocks had been pledged for notes and gave full details thereof—the valuations of the stocks, the amounts of the notes and the then equities, and the decree approving the account was never appealed from.

It is found that at the time of the hearing of the petition for the removal of the trustee all the securities of the estate were pledged for the obligations stated save about $1000.

Aside from those necessarily sold to pay administration expenses, all the securities which were in the name of the testator at the time it was taken over by the executor are still held in the estate, together with the additional securities taken over from Boswell, and no money has been borrowed save as above shown. The trial court has found as its first conclusion after the hearing that the trustee acted honestly and in good faith in the administration of this estate.

The specific question for the Court of Probate was whether, under the foregoing circumstances, the trustee had become liable to removal by that court for the reasons set out in the petition on June 18th, 1932, the grounds therein stated being that the trustee had (1)

become incapable of executing the trust, (2) neglected to perform the duties of a trustee and (3) permitted the estate to become wasted.

All the acts of the trustee were done honestly and in good faith and in the exercise of its best judgment, as the court finds and as shown by the fact that in each instance it petitioned the Court of Probate for advice and direction. When the estate came into its hands as trustee, the executor's final account showing the loans and the pledging of securities had been accepted by the Court of Probate, after notice, and a copy given to the widow. The beneficiaries took no appeal from that decree of the Court of Probate in accepting the account and in passing the estate on to the trustee for administration, and their case must rest upon acts or omissions by the trustee as such.

It is found that the testator believed his investments were permanent ones, and in the fifth paragraph of his will he authorizes and empowers the trustee to make investments and reinvestments as the latter might deem wise, disclosing a clear intent that the trustee should not be bound by statutory requirements for the investment of trust funds. The latter was entitled to retain the investments made by the testator until otherwise ordered by the court. General Statutes, § 4837.

It is obvious that the testator intended to vest the trustee with authority to act in its own best judgment for the interest of the estate and this the court has found that it did. Not only so, it did not act solely upon its own judgment but in every case procured the advice and sanction of the Court of Probate wherein the estate was being administered. It is apparent that it was the combined judgment of the court and the trustee that the abrupt fall in the market value of the securities justified a continuance of the loans rather than a closing-out and a sacrifice of the securities. It

cannot be fairly said that such a decision was unreasonable under the then prevailing conditions and its reasonableness is obviously not to be tested by succeeding events such as the unparalleled fall in security values which continued during that period. The trustee preserved all the securities which the testator had acquired and desired to permanently keep and were it not for the unprecedented depreciation in values which has overtaken the security market, the wisdom of so doing would have been amply justified. In other words, if the market value of the securities which it held instead of decreasing, had remained or increased, there would be no question raised against it such as is now raised. The trustee indulged in no speculative investment, nor were any of its acts speculative in character unless it be held speculative to honestly decide when it is best to sell a security, as it clearly is not. Most if not all the securities shown in the record are such as cannot be properly denominated speculative and there is no finding that any of them were such.

The analogy between the present situation and that disclosed in *Mathews* v. *Sheehan,* 76 Conn. 654, 57 Atl. 694, upon which the petitioners rely, fails in essential particulars. In that case the administrators were aware that part of the fund which they were to administer "was subject to the great hazards of the business of stock speculation" and it was held to have been their duty to "withdraw the securities from the perilous business in which they found them pledged," but that on the contrary "they carried these accounts along as speculative accounts, for speculative purposes, in the hope of gains purely speculative and problematical," much as they had been carried on in the lifetime of the testator. Not only were the old speculative accounts continued but new ones were opened and were continued for four years by the administrators. The

court further found that the securities could have been disposed of at any time during that period with advantage to the estate. It was found that the administrators "against the expressed wish of the appellant, continued to carry the speculative accounts as such." Under these circumstances, a conclusion that the administrators' actions were unwarranted was of course justified. In the present case, the margin accounts were not continued but were closed up, thus terminating the risks to which the pledged securities were subject in a margin account. The securities were retained by the trustee because the testator had looked upon them as permanent investments and had unmistakably indicated in his will that they might be continued by the trustee in the exercise of its best judgment. After the acceptance by the Court of Probate of the final account of the executor, in which it appeared that the margin accounts had been closed out by the loan secured from The New Britain Trust Company, these petitioners cannot be heard to object to that course of action. The trustee in the present case has done exactly what the court in the *Mathews* case said the administrators should have done, that is, it settled the margin accounts within a reasonable time and withdrew the securities from the risk of a margin account.

The analogy which the petitioners seek to draw with the case of *In re Hirsch's Estate,* 116 App. Div. 367, 101 N. Y. Sup. 893, 188 N. Y. 584, 81 N. E. 1165, also fails for much the same reasons. In this case the executors borrowed money and deposited it with other money of the estate to maintain a margin account, with resulting loss to the estate. The court remarked that the power which was given to the executors under a codicil to the will, to invest in the securities not permitted by statute for trust funds, "would possibly have

authorized the executors, if they had money of the estate in their hands, to have paid up the amounts due to the brokers by the testator and taken over the stocks which the testator had purchased as investments of the trust estate. But that was not done, and was not intended to be done." In the case at bar, that is precisely what *was* done. The conclusion of the court in that case, that "the contribution of trust funds to continue what is purely a speculation, like the purchase or carrying of stocks on margin, can never be justified under a power to invest the principal of a trust estate," is not one which has any application to the facts of the case at bar. The borrowing of money necessary to close out margin accounts and to protect the securities pledged to the Boswell loan and the payment of the margin accounts of the testator, amounted to nothing more nor less than an investment made by the trustee in the securities so held. "Trust funds received by executors, trustees, guardians or conservators may be kept invested in the securities received by them, unless it shall be otherwise ordered by the Court of Probate or unless the instrument under which such trust was created shall direct that a change of investments shall be made, and the trustees thereof shall not be liable for any loss that may occur by depreciation of such securities." General Statutes, § 4837. "The property made over to the trustees was not of the kind in which trust funds are ordinarily invested. Under General Statutes, § 255 [now § 4837], however, trustees are authorized to hold such securities as may be received by them as constituting the trust estate, without altering the form of investment, unless otherwise ordered by the Court of Probate, so long as in the exercise of reasonable prudence they may deem it unnecessary to make any change." *Beardsley* v. *Bridge-*

*port Protestant Orphan Asylum,* 76 Conn. 560, 564, 57. Atl. 165; *Clark* v. *Beers,* 61 Conn. 87, 23 Atl. 717.

In honestly endeavoring to preserve the securities which the testator had purchased as a permanent investment, we hold the executor and trustee alike were justified by the obvious intent expressed in the will as well as by the terms of the statute and the orders of the Court of Probate. "Courts have no occasion for interference with investments made by the trustees within the discretionary powers vested in them by the trust instrument unless it appears that they have not acted in good faith or that they have abused the discretion vested in them." *McCarthy* v. *Tierney,* 116 Conn. 588, 592, 165 Atl. 807. Such loss as the estate has suffered has obviously been caused not by the acts or omissions of the trustee but by the shrinkage in the value of the very securities which the testator himself purchased and with which he created the trust. The integrity of that fund would be complete today were it not for that shrinkage. In the facts which we have summarized we are unable to find justification for the conclusion that the trustee has neglected to perform the duties of its trust or that the wasting of the estate is attributable to it. General Statutes, § 4962.

Thus, the refusal of the Court of Probate to remove the trustee on either of these grounds, was not that abuse of discretion which is the essential question raised by this appeal. The statute gives that court the power to remove a trustee who has neglected the duties of the office or wasted the estate, or has become incapable of performing the duties of a trustee. General Statutes, § 4962.

The petitioners' brief makes the claim, without citing authorities, that the fact that this trustee is in re-

ceivership "shows that the trustee has become incapable of executing the trust." We cannot find in the record that this specific question was presented to or decided by the Court of Probate or the Superior Court. It is a question of law which the trial court did not mention as such in deciding the issues. It listed the receivership as one of the facts, among others, upon which it concluded that the receiver should have been removed. Under the statute, the matter was addressed to the sound discretion of the Court of Probate, and its conclusion cannot be disturbed upon appeal, unless the discretion was abused. *Carroll* v. *Arnold,* 107 Conn. 535, 542, 141 Atl. 657.

Insolvency or bankruptcy is not, *per se,* a legal disqualification for the duties of a trustee. Amer. Law Institute, Restatement, Trusts (Tent. Draft No. 1) § 103 (d); *Rankin* v. *Barcroft & Co.,* 114 Ill. 441, 456, 3 N. E. 97; *Moorman* v. *Crockett,* 90 Va. 185, 198, 17 S. E. 875; *Shryock* v. *Waggoner,* 28 Pa. St. 430, 432; *Morgan* v. *Morgan,* 3 Dem. Surr. (N. Y.) 612, 615; Perry, Trusts (7th Ed.) Vol. 1, § 279, also § 58. In England, insolvency or bankruptcy has been regarded as a ground of removal, save under special circumstances. Jessel, M. R., in *In re Barker's Trusts,* L. R. 1 Ch. Div. 43, states the reason to be that "a necessitous man is more likely to be tempted to misappropriate . . . than one who is wealthy; and besides, a man who has not shown prudence in managing his own affairs is not likely to be successful in managing those of other people;" but this reasoning obviously has no application in the present case.

We conclude that the Court of Probate was justified in refusing to remove the trustee. It follows that the action of the trial court in sustaining the petitioners' appeal on the ground that the Court of Probate had abused its discretion is likewise without support.

There is error, the judgment of the trial court is reversed and that court is directed to enter a decree in favor of the defendant.

In this opinion the other judges concurred.