JOHN W. FORTUNE v. FIRST TRUST COMPANY OF ST. PAUL AND ANOTHER.[1]

July 2, 1937.

Nos. 30,951, 30,974.

[1]Reported in 274 N. W. 524.

*Fred L. Doud, Bruce J. Broady,* and *Thomas F. Clifford,* for plaintiff-appellant.

*John J. Keefe,* for respondent John H. Boemer.

*Clapp, Briggs, Gilbert & Macartney,* for respondent First Trust Company of St. Paul.

JULIUS J. OLSON, JUSTICE.

When plaintiff rested defendants did likewise for the "purpose of making a motion for dismissal" of plaintiff's cause, requesting the "privilege of reopening and introducing testimony if the motion is overruled." The court granted the requested privilege, plaintiff not objecting, and defendants then moved "that this action be dismissed on the ground that the evidence does not justify findings or a judgment against either defendant." After hearing arguments of respective counsel the court granted the motion. Later defendants were permitted, over plaintiff's objection, to introduce testi-

mony as to the value of attorneys' services rendered in their behalf in this cause, it being their theory that such were recoverable in this proceeding. The court denied any allowance. Plaintiff was unsuccessful on his motion to vacate the order of dismissal and for an order substituting findings of fact and conclusions of law or for a new trial; and so also were defendants on their motion for findings or for a new trial in respect of their claimed attorneys' fees. By appropriate appeals these orders are here for review.

Plaintiff's cause is based upon alleged negligence on the part of defendants in the management of a trust estate whereof he was both the settlor and *cestui que trust*. Defendants answered separately, each pleading the general issue, also, as an affirmative defense, that the trust had been terminated pursuant to plaintiff's request and in accordance with the trust agreement, and that they had delivered to plaintiff and he had duly receipted for all the trust property involved in the trust arrangement. The written instruments upon which this defense was based were pleaded *in haec verba* and true copies attached to the answers as exhibits. The only exhibit that need be noted is exhibit C, which reads:

"I, John Walker Fortune, acknowledge receipt from the trustees under agreement with me dated October 26, 1929, of all of the property held by the trustees under said agreement, and I hereby release the trustees from any liability or further responsibility to me on account of the property so held by them, and on account of their acts while acting as trustee for me.

"[Signed] John W. Fortune."

In his reply plaintiff admitted the execution and delivery of the pleaded exhibits. To avoid their effectiveness (particular reference being had to said exhibit C), he claimed that it "was executed and delivered by plaintiff wholly without consideration and is void"; that when he notified defendants of his desire to terminate the trust agreement they prepared a form of notice of termination (exhibit B) and the release (exhibit C), "and informed plaintiff that in order to terminate said trust and to recover his property, it was necessary that he sign both said documents, and it was not

until plaintiff would and did sign said purported release that defendants delivered to him his said property. That plaintiff executed said purported release relying upon said representations and believing that the only way he could reclaim his property from the defendants was by signing said purported release; that in truth and in fact, said representations were false and known to be false by the defendants, and each of them, and were made by defendants in the knowledge that they had been remiss in discharging their duties as trustees as in said complaint alleged, and with the intent that plaintiff rely thereon and thereby be deceived and thereby barred from asserting his cause of action against defendants."

As plaintiff's cause was dismissed for lack of sufficient evidence to sustain his claims, it is necessary that the facts be rather fully stated. He was 42 years of age at time of trial, October, 1935. In May, 1917, he enlisted for war service in our late World War, serving in the navy as a seaman of the second class for some three months, later taking instruction in a radio school conducted by the government. He became a proficient wireless operator, serving in that capacity until discharged from service August 13, 1919. After such discharge he entered and was graduated from the Twin City Business University of St. Paul, having taken courses in "accountancy, English and business law and other allied subjects." His training was later supplemented by further study at the University of Minnesota in "higher accountancy, economics and business law." For a period of 13½ years next preceding the time of trial he had been and then was engaged as a clerk in the delivery section of the St. Paul post office.

Plaintiff's father died testate October 17, 1929, possessed of an estate consisting principally of stocks and bonds. Under the terms of the will, plaintiff and his brother shared equally in the property left by him. A few days after the father's death the two brothers and a long-time family friend and business adviser, defendant Boemer, went to the trust company, and there the father's safety deposit box was opened "and the securities were taken out and enumerated." The trust company was the named executor of the will and in that capacity duly and promptly proceeded with pro-

bate thereof so that on July 19, 1930, a final decree was issued vesting in plaintiff and his brother, "in equal shares," the property left by testator. The executor was later discharged. No one now questions the propriety and finality of these proceedings.

Plaintiff requested that the trust company take over the handling of his property so to be received by him from his father's estate, expressing the wish that a living trust be created "so that it would be impossible for me to ever get my hands on the money." He wanted the income only. The trust officer with whom he conferred said this could not be done and that no such relationship was wanted. After some discussion of the subject, it was finally arranged, so plaintiff testified, to have some "outside man to act as trustee, and I knew of nobody I could trust or rely on of all my dad's friends or my few friends with the exception of Mr. Boemer; and I asked him if he would care to act as co-trustee, and he finally accepted." Accordingly, the trust agreement was executed on October 26, 1929. Under its terms defendants as trustees were invested *"with full power to retain any and all investments which may come to them as trustees;* shall invest and reinvest all principal sums of money in such stocks, bonds, notes, mortgages or other forms of property as the said trustees jointly may approve without being confined in their selection of investments to those authorized by statute for the investment of trust funds." (Italics supplied.) Plaintiff reserved to himself "the right by and with the consent and approval of the individual trustee hereinbefore named to amend the terms of this trust, or to terminate it *in toto* by instrument in writing duly executed and delivered to the trustees."

After the final decree had been issued and the probate proceedings concluded, to make effective the purposes of the trust, the various stocks and other securities had to be sent to the various corporate enterprises issuing them for suitable transfers and the issuance of new certificates. This was done, and sometime in August the trustees became the legal owners of these instruments in their trust capacity. It will thus be seen that all of the securities left by the elder Fortune were transferred to the two sons. As to plaintiff's interests, after the stocks and securities had been

divided, the trustees became invested with full authority to proceed with the discharge of their duties pursuant to the agreement made. During the intervening period from the date of the trust agreement until its termination, plaintiff was fully informed of the fact that the original stocks and other securities were being retained. The files contain voluminous correspondence between plaintiff and the trust company. It is replete with requests by plaintiff for money received in the way of dividends. Plaintiff knew when these dividend payments were ordinarily paid, and he was very prompt in getting from the trust company the proceeds as soon as available. During the time this trust was in existence the trust company received and paid to plaintiff all the income (excepting only its lawful charges, which are not in dispute). The income during the 17 months of the continuance of the trust amounted to $3,005.75. Plaintiff also received the proceeds of certain properties sold at his request. There is no issue made respecting the propriety of these items so no further consideration need be given them.

Plaintiff's theory is that because these stocks were of a somewhat speculative type it became the duty of the trustees at once to convert them into safer securities and that as a consequence of defendants' failure so to do he should be awarded judgment for the difference in value between what these securities were inventoried and valued at when the trust was created and what they were worth when he received them at the end of the trust period. It is well to note that during the time the estate was in progress of probate there was a shrinkage in value of something like $17,000. There was a further shrinkage of something like $31,000 in value from the time the trustees took the matter in hand (August, 1930) until the termination of the trust (March, 1932). Also to be noted is the fact that as soon as plaintiff had received these securities from the trustees he promptly proceeded to dispose of all thereof so that by October nothing was left of the property left him by his father. The present suit was begun July 30, 1934, two years and three months after the termination of the trust.

Plaintiff testified that defendant Boemer and plaintiff's father "were very close friends," in fact "confidants." He "was closer

than any of the others." Also, "I would say Mr. Boemer would be a litle better than half responsible for the building of the estate" left by the father. Virtually this entire estate was built up by the father with the assistance of Mr. Boemer out of a capital investment of between $2,500 and $3,000. Hence it is obvious that it was built up in no other fashion than upon stock investments that were necessarily of a more or less speculative type.

Immediately upon completion of the transfer of the securities from plaintiff to defendants as trustees, August 4, 1930, the trust company furnished plaintiff with a complete list of all property included in the trust agreement. Thus plaintiff was fully and truthfully advised of what these securities consisted. From the very inception of plaintiff's dealings with the trust company and until termination of the trust plaintiff knew exactly what the property was and its so-called speculative character. His knowledge of and acquiescence in the entire matter are patent to anyone reading the correspondence he had with the trust company. Thus on January 19, 1931, he wrote: "I would like to have these dividends as soon as you receive them." (Defendants' exhibit 4-R.) Again on January 23 he mentioned the fact that he wanted money with which to meet bills—"the main reason for asking that the dividends due on March 1 from Shafer Oil, March 16 from Standard Gas, April 1 from Byllesby, and April 15 from Tel. & Tel. will help in paying off or bringing them [bills] up to the present." (Defendants' exhibit 4-V.) Not until March 21, 1932, did he complain or in any way criticize what the trustees had done. In this letter the only fault he seems to find with the trust company's handling of the affair relates to a commission that he thought should go to a Mrs. Farrell for rendering assistance in selling some real property belonging to plaintiff and his brother. He said: "I do not insist that Mrs. Farrell be paid the full commission, but she is entitled to at least 50%. If this is not agreeable to you I intend to dissolve the trust that your company is handling for me according to the clause in the contract made when the trust was formed in 1929, giving me this right. The way your company has handled the securities I placed in your care, has been disgraceful to say the

least." On March 27 he notified the trust company "that the trust you have been administering for me is to be terminated this date March 28, 1932, in accordance with the clause in the agreement signed by your company and myself in October 1929 allowing me to do so. Please arrange to have the securities you are holding in this trust transferred to my name immediately, and inform me when you have done so. I will call for them in person." On March 28 he wrote Mr. Boemer to the same effect, with this added: "I consider myself capable of handling what remains of the securities as well as the Trust Co., has done in the past and also by this action eliminate the fee for administering the same. I also wish to thank you for your assistance and cooperation in this matter, and hope that our relations will remain the same as in the past." Pursuant to this request, the trust was closed and the securities transferred to plaintiff without any objection on the part of anyone or exception thereto of any kind. As a matter of fact he went over the statements of the account, a balance was found to be due him for $309.64, and a check was duly issued to him therefor which he promptly cashed. Not until this action was started did either defendant have the slightest intimation that there was any criticism of the manner in which the trust property had been handled.

■ The object of pleadings "is to apprise each party of the grounds of claim or defence asserted by the other, in order that he may come to trial with the necessary proof and be saved the expense and trouble of preparing to prove or disprove facts about which there is no real controversy between the parties." 5 Dunnell, Minn. Dig. (2 ed.) § 7498. While pleadings are "but means to an end, the end being the proper administration of the substantive law," yet the rules thereof "are to be applied and enforced so as to disclose fully and freely the respective claims of the parties and facilitate and hasten the trial of issues." *Id.,* § 7498a.

In substance our rule as stated in Dunnell's Digest is the rule everywhere. It is stated in 21 R. C. L. p. 436, § 1, thus:

"* * * in the commonly accepted sense the object of pleading is to notify the opposite party of the facts which the pleader ex-

pects to prove, and so it is that the allegation of such facts must be made with that certainty which will enable the adverse party to prepare his evidence to meet the alleged facts."

■ Plaintiff made no effort to prove any of the allegations of his reply. Thus, by his own pleading, exhibit C stands an admitted verity. No evidence whatever was adduced to imperil or minimize its obvious purpose. Instead of fraud or duress having been practiced by defendants, the opposite seems clear. Thus, as a matter of fact, when plaintiff had written his letter of March 27 demanding termination of the trust (from which quotations have heretofore been made) the trust company on the following day (March 28) wrote him as follows (defendants' exhibit 4-NN):

"We have your letter of March 27 and note what you say about the termination of your trust. You will remember that your trust agreement provides that the trust can be terminated at your option by and with the consent and approval of the individual trustee. We have prepared herewith a document for your signature and for that of Mr. Boemer. Will you date and sign the instrument and then forward it to Mr. Boemer for his signature?"

Pursuant to the quoted instructions, plaintiff executed exhibit C, and on the next day, March 29, the trust company received the same, together with Mr. Boemer's consent to the termination of the trust. By admitting the execution and delivery of the pleaded release in and by his own pleading and having wholly failed to establish any basis for its avoidance, it necessarily follows that proof of its existence and binding effect was not an issue.

"One of the primary rules of pleading is that where there is a material averment, which is traversable, but which is not traversed by the other party, it is admitted. * * * Pursuant to this principle, if a fact is admitted in the pleadings on which the case is tried, it is, in general, assumed without other evidence to be conclusively established for the purposes of the trial; because a party is estopped by the allegations in his own pleading." 21 R. C. L. pp. 561, 562, § 120.

Under our system of pleading the reply is ordinarily the last pleading. In the instant case, plaintiff having admitted the exhibits to which we have referred and having sought to avoid their consequences by pleading avoidance, the burden necessarily rested upon him to go forward with his proof. If he had not replied at all can there be any doubt that defendants would have been entitled to judgment on the pleadings? And is not the same reasoning just as compelling here? Rosenthal v. Supreme Ruling, 129 Minn. 214, 215, 152 N. W. 404, does not help plaintiff's position. There the reply was construed by the court *not to be* an admission of certain allegations pleaded in the answer; hence the duty of going forward with proof as raised by the answer rested upon defendant. The reply there involved read as follows:

"Plaintiff admits that the rules and laws of the defendant require of its beneficiary members the payment of certain assessments by way of insurance premiums, and alleges that Rosa Rosenthal during her membership in said respective orders, and up to the time of her death, was ready, able and willing to pay all such assessments, and in fact did pay all assessments which the defendant herein required or permitted her to pay, and the defendant waived the payment of any other and further assessments or dues than those actually paid by her."

On the trial of that case, defendant having conceded that it did not question the adequacy of proof of death, plaintiff rested after introducing the insurance certificate. Defendant's motion to dismiss on the ground that plaintiff had not proved the payment of dues and assessments or any excuse for nonpayment was denied. It then proceeded to offer evidence with respect to its defense on the ground of fraud, but offered no evidence as to the failure to pay assessments or dues. Obviously, upon that state of the record, defendant could not hope to attack that portion of the reply we have quoted. That case is clearly of no value to plaintiff.

What has been said might readily be made the sole basis for affirmance on plaintiff's appeal. But counsel have with so much diligence and earnestness argued and briefed the merits of the case

that we think it proper also to consider these in arriving at decision.

█ From the recited facts it is obvious that no bad faith appears, nor has any ulterior motive on the part of the trustees or either of them been shown; in fact, the contrary affirmatively appears. The accounts rendered were correct in every respect. Nor was there any showing of lack of intrinsic worth of the involved securities. The determinative question hinges upon whether the trustees used reasonable judgment in holding the securities in question under the facts and circumstances here appearing. Bearing in mind that the contract creating the trust granted the trustees "full power to retain any and all investments which may come to them as trustees"; that the market was a fluctuating one and that plaintiff and his personal friend and adviser, defendant Boemer, were fully and truthfully advised of the exact situation at all times; that the wisdom or propriety of holding the stock or selling same was a matter of mutual concern between plaintiff and his trustees; that on at least one occasion the sale of certain portions thereof was recommended by the trust company but not thought advisable by Mr. Boemer; that all thereof had been acquired by testator and had proved profitable to him; that this was a trust for the living, not an estate to be wound up; that plaintiff was a man who kept himself informed on such matters and was experienced and informed as to markets and market trends—all of these matters necessarily must be considered in determining whether defendants exercised reasonable judgment in holding the property left with them during a time when there was much doubt and uncertainty as to market values of all kinds of property.

The rules guiding decision here are well known. As was said by the New York Court of Appeals in Matter of Clark, 257 N. Y. 132, 136, 137, 177 N. E. 397, 398, 77 A. L. R. 499, 502, 503:

"* * * 'the just and true rule is, that the trustee is bound to employ such diligence and such prudence in the care and management, as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs.' (King v. Talbot, 40 N. Y. 76, 84, 85.) The statement has been frequently approved.

(Matter of Weston, 91 N. Y. 502, 511; Costello v. Costello, 209 N. Y. 252, 261, 103 N. E. 148.) In determining whether the acts of a trustee have been prudent, within the meaning of the rule, we must 'look at the facts as they exist at the time of their occurrence, not aided or enlightened by those which subsequently take place' (per Peckham, J., in Purdy v. Lynch, 145 N. Y. 462, 475, 40 N. E. 232, 236) ; for it is an obvious truth that 'a wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by' (per Collin, J., in Costello v. Costello, supra, at p. 262) ; and it is impossible to say that trustees are wanting in sound discretion 'simply because their judgment turned out wrong' (per Holmes, C. J., in Green v. Crapo, 181 Mass. 55, 58, 62 N. E. 956, 957). We must distinguish also between the acts of trustees in making investment of trust funds, and their acts in making, or failing to make, prompt disposition of securities received from the hands of the creator of the trust. (Matter of Weston, supra; Jones v. Jones, 50 Hun, 603, 2 N. Y. S. 844; Matter of Mercantile Trust, 156 App. Div. 224, 141 N. Y. S. 460; Matter of Chapman, [1896] 2 Ch. 763.) Self-evidently the purchase of a speculative stock by a trustee is one thing; the retention of such a stock awaiting the arrival of a favorable opportunity to sell, is quite another; the former would constitute negligence; the latter, regarded prospectively, might be prudent, although in retrospect it might seem to have been a grievous error. Furthermore, the distinction between negligence and mere error of judgment must be borne in mind. 'Trustees acting honestly, with ordinary prudence and within the limits of their trust, are not liable for mere errors of judgment' (per Lindley, J., in Matter of Chapman, supra, at p. 776) ; a trustee should not be held liable 'for unfortunate results which he could not be expected to foresee and was powerless to prevent' (Ormiston v. Olcott, 84 N. Y. 339, at p. 347)."

Counsel for plaintiff cite and much rely upon the recent case of In re Busby's Estate, 288 Ill. App. 500, 6 N. E. (2d) 451. Plaintiff claims that case to be authority for his position. We have read that opinion with much interest and find it to be an excellent ex-

position of the law. But plaintiff's difficulty is that his alleged cause is not founded upon anything similar to the facts set forth in the Busby case. In that case the facts were that decedent, who died September 9, 1930, was the owner of a large quantity of stock in corporate enterprises, by far the greater portion of which was pledged as security with brokers and banks for loans. There the total market value of the pledged stocks as of the date of Mr. Busby's death amounted to $1,448,216.53, amount of indebtedness against the same and for which the stock certificates were held as security, $946,433.21, leaving value of equity $501,783.32. The estate was also possessed of cash and unpledged assets amounting to $187,128.33. On September 16 "the investment committee who had the final decision with respect to trust management and investment policies particularly" (*Id.*, p. 508) recommended the sale of some $833,000 of stock not deemed safe to carry in view of market conditions. On September 23, within two weeks after her husband's death, Mrs. Busby approved "the immediate sale at the market of the securities in list 'A'" (*Id.*, p. 513), that being the securities deemed by defendant's own committee advisable to sell "at the earliest possible moment." (*Id.*, p. 508.) The men comprising the committee "were selected with a special view of their fitness for the job." (*Id.*, p. 508.) Instead of so doing, the executor bank sold only $140,000 of these securities and then secured a loan of $520,000 from its affiliate, virtually itself, to pay the outstanding balance on brokerage accounts, taking assignments of the same and with them the pledged stock, also using the unpledged assets of the estate as well as the cash on hand in accomplishing this result. And, as said by the court:

"Thus the only unincumbered assets left by the deceased, both cash and securities, which would in themselves have comprised a not inconsiderable estate, were sacrificed to Mr. Traylor's urge to carry on the speculation." (*Id.*, p. 529.) (Mr. Traylor was the officer of the bank in charge of the estate of the deceased.) "Even Mr. Traylor recognized their perilous nature when he told Mrs. Busby on September 23, 1930, that if the market decline continued

at an average of a point a day the estate could be entirely wiped out in ten or twelve days." *(Id.,* p. 523.) "Mr. Traylor knew that the assets of her deceased husband's estate were all that stood between Mrs. Busby and her children and comparative privation. Yet he was willing to stake their all on a rise in the market.. In our opinion his conduct in so doing was not only imprudent and negligent but positively reckless. He was dealing with the property of a widow and minor children, and it was hardly a matter of judgment as to whether or not he ought to take a chance on sacrificing the sole resources intended to provide for their future welfare and livelihood." *(Id.,* p. 530.) Naturally and properly the court held the executor to liability because "grossly negligent in permitting the total destruction of the assets of the estate herein." *(Id.,* p. 531.)

The opinion mentioned is in strict conformity with well-established principles. We find nothing therein in the slightest aiding plaintiff. After all, one must always look to the distinctive facts in each case and determine therefrom liability or lack thereof. Re Parson's Estate, 143 Misc. 368, 257 N. Y. S. 339; In re Pratt's Estate, 143 Misc. 751, 257 N. Y. S. 226.

Another important distinction between the Busby case and the one before us is that all the securities here involved were turned over to the beneficiary. He has disposed of the same and as such is not in position to restore them. In the Busby case the executor was possessed of these at all times and has never surrendered them, nor is it required so to do but is simply charged with plaintiff's loss.

In addition to the many authorities cited by the court in the Busby case, see also 77 A. L. R. 508, *et seq.*

"*b. Right or duty to retain securities as contrasted with right to invest.* * * * 'There is a great difference between an investment by the trustees of moneys forming a part of the estate, and the retention of securities purchased by the testator and held by him at the time of his decease. In the one case the investment, whether wise or unwise, is the independent, uncontrollable act of the owner,

and in the other it is the act of the trustees, whose discretion is limited and whose duties are prescribed, and each is to be subjected, therefore, to wholly different rules, if, indeed the act of the owner is subject to any rule whatever.'" Jones v. Jones, 50 Hun, 603, 2 N. Y. S. 844, 19 N. Y. St. Rep. 436. The cited case was later cited with approval in In re Winburn's Will, 140 Misc. 18, 249 N. Y. S. 758.

■ The record is such as to leave no doubt that plaintiff acquiesced in the conduct of defendants. He was of full age, competent, and apprised of all facts during the administration of his trust. The co-trustee was his own appointee, serving without compensation. He knew more about this property than anyone else because he had acted with the elder Fortune during the time this property was acquired. Plaintiff himself put into the trust the property retained by the trustees. Like other property of this type, in fact of every kind of property during the period involved, it was subject to fluctuation. Market values were uncertain. No one could foresee or foretell what the future had in store. To hold defendants to liability upon the facts here appearing is equivalent to holding every trustee to the liability of an insurer. "And while no rule of proper responsibility should be relaxed, yet where he [the trustee] acts honestly and in good faith, and with reasonable prudence and discretion, he should not be held liable for unfortunate results which he could not be expected to foresee and was powerless to prevent." Ormiston v. Olcott, 84 N. Y. 339, 347. See 26 R. C. L. p. 1311, § 165, "Acquiescence of beneficiary; retention of existing investment in stocks and bonds."

### RE DEFENDANTS' CROSS-APPEAL.

■ It is claimed that Andrist v. First Trust Co. 194 Minn. 209, 260 N. W. 229, is authority for defendants' claim that they should have been allowed attorneys' fees and that the court erred in not granting such. The cited case does not go to the extent suggested by them. Here the trust had been completed and everything ended more than two years before the present cause was started. Defendants were not called upon to protect or preserve any property or

right in the trust estate. They were simply called upon to defend alleged misconduct while in charge of the estate. As such the burden is and should be theirs, the same as any other litigant. It would be a strange rule indeed if a fiduciary, after completing his trust and settling with the beneficiary, later being sued for alleged wrongdoing, could, if he prevailed, recover attorneys' fees against one who might well think he had good ground for that kind of action.

Both orders are affirmed.

PETERSON, JUSTICE (dissenting).

I dissent.

MR. CHIEF JUSTICE GALLAGHER, not having been a member of the court when this case was argued and submitted, took no part in its consideration or decision.

MR. JUSTICE STONE took no part in consideration or decision of this case.

