[1] Reported in 3 N.W.2d 226.
For review is an order denying appellants' alternative motion for amended findings or a new trial. They are the children and grandchildren of Thomas A. McCann, deceased, and "the vested and contingent beneficiaries of the trust" created by his will dated February 24, 1922. Testator died October 20, 1925. Respondents *Page 235 
are the surviving trustees, who with one Moore were named executors of the will and trustees thereunder. All of them qualified as executors and so functioned until the probate proceedings were completed December 1, 1926. They were duly discharged as executors on February 9, 1927. While these proceedings were pending, and pursuant to authority granted by the will, they formed a Minnesota corporation, The McCann Company, to take over the estate property when the probate proceedings were closed. On December 1, 1926, having qualified as trustees, the final decree was issued assigning to them as trustees all of decedent's residual estate (with minor exceptions not now material). All of the residual estate had been turned over to the newly created corporation, and in its decree the probate court assigned all the common corporate shares (900) in that company to the trustees "upon the trusts and to and for the uses and purposes in said will set forth." In conformity with the decree, respondents, as executors, turned over to themselves as trustees all the shares of that company. That stock is still owned and held by them as surviving trustees. All three trustees continued so to act until October 25, 1939, when Mr. Moore died. Since then respondents have continued in the discharge of their official duties.
Decedent died a young man, only 39 years of age, and was survived by his widow, then 40 years of age, and four minor children ranging in age from one to 13 years. Mrs. McCann died testate October 15, 1940. Her sons Thomas A. and John M. McCann and her son-in-law, Manion J. Pritchard, were appointed administrators c. t. a. of her estate. Since her death occurred after these proceedings were commenced but before trial, these men were substituted in her place. No appeal has been taken by them as representatives of her estate.
To obtain an adequate picture of the issues presented, some additional facts should be stated:
Testator's business activities vividly portray him as an active, energetic, and thoroughly capable man. In the brief period of 18 years, he had advanced from the position of office boy in one of *Page 236 
the "Shevlin" corporate enterprises to that of vice-president and general manager of Shevlin, Carpenter Clarke Company, and to that of vice-president of Shevlin-Hixon Company and McCloud River Lumber Company. He was also a member of the board of directors of each company. Substantially all of his estate consisted of corporate stocks in these corporations. He was also an officer and director of other affiliated companies, his salary for some years previous to his death being $35,000 a year. In his chosen field he had become a man of national reputation, being "vice-president of the National Lumber Manufacturers Association," and of which he "was expected soon to assume the presidency."
The executors and trustees had been and were his personal friends and business associates over a period of years. Mr. Moore was his wife's brother. All of them worked together in complete harmony, and each had for the other the highest respect and confidence as to business capacity as well as integrity. No one's integrity is questioned here, nor is honesty of purpose challenged. The sole basis for the present controversy is that as trustees they should have sold certain stocks to obtain funds to redeem the preferred stock issued by The McCann Company and acquired by the widow. Failure "to cause such action to be taken" is what is now said to "constitute a breach of trust." While several findings and conclusions have been assigned as error," they "all relate to the question stated."
Testator's estate was inventoried and appraised in the probate court, in round numbers, at $750,000. Substantially all of it consisted of stock in Shevlin corporations. Amongst these were 1,000 shares of McCloud stock appraised at $200 per share, or $200,000. These shares were encumbered to the extent of $170,000, that being the unpaid balance of the original purchase price of $200,000. These shares were sold by the executors at $225 per share, the money being used in payment of the secured debt and the balance applied in payment or reduction of other estate obligations. Testator owned 193 shares, unencumbered, and of the same appraised *Page 237 
value. He also owned 3,875 shares of Shevlin-Hixon stock, 2,250 shares of which were encumbered by "stock carrying contracts" aggregating, with interest, $234,000. This stock was appraised at $125 per share, or $484,375. The 2,250 encumbered shares at that appraisal left a net estate equity of about $47,000. This left 1,625 shares therein unencumbered. And, as we have seen, failure to sell enough of this encumbered stock to liquidate the debt against it is the basis for the present litigation.
That the executors and testator's widow were concerned about these obligations and how to get rid of them is apparent from the record. She was much opposed to the sale of any of these stocks, since she considered them good and safe investments. And no one familiar with the facts doubted that they were good, safe, and income-producing investments. Retention of these stocks, she insisted, would but accord with her own judgment and would also conform with what her husband had always desired and advised. Having received $160,000 from insurance policies and other sources from her husband's estate, she deemed it desirable and prudent to invest her money in such fashion as would help take care of the stock-carrying contracts and also afford her a safe investment with adequate income. To make this possible, The McCann Company was organized, and the entire issue of preferred stock was awarded to her in that amount, which was in turn applied by The McCann Company upon its indebtedness under the stock-carrying contracts, leaving a balance of $70,000, for which a note was given by it and later paid. In the meantime, the holders of these claims had presented them for allowance in the probate court. They were there allowed and later fully discharged. The court was fully informed of all the facts. The executors' final account was duly settled and allowed. There has been no appeal from that order or from the final decree.
Testator's will granted to his executors and trustees very broad powers. They were given the widest scope as to the exercise of their judgment. In language free from doubt they were directed to retain the assets found in the estate "so long as they * * * *Page 238 
shall deem prudent." Authority to make "such new investments as they in their best judgment and discretion shall deem advisable and advantageous to my estate" was given, and, specifically, "without confining them to such investments as the law directs for the investment of trust funds, hereby allowing them full power to select any investments or securities they may approve." And, "reposing full confidence in the ability and integrity of my trustees * * * I hereby direct that no bond or security shall be required from said trustees." They "shall at no time be liable on account of any investment that they may make, however such investment turns out, hereby intending that my said trustees shall not be liable for any mistake of judgment in the conduct of the trust estate hereby bequeathed to them." Further recitals might well be made, all indicative of the same general and broad purposes as those quoted. But enough has been said to establish that in granting them authority testator had implicit confidence in the judgment of his long-time friends and business associates.
Before arrangements were made for the formation of The McCann Company and the issuance of the preferred stock, the executors carefully reexamined and scrutinized the holdings of the Shevlin-Hixon Company, considered and weighed its past history, its then present worth, and its likelihood of continuing to be a safe money-maker and income producer. They ascertained that the normal expectancy of the timber then owned was 19 years. Book values were increasing from time to time. The company was paying substantial dividends and had declared a stock dividend only a few years before amounting to 50 per cent. As of January 1927, well informed lumbermen estimated that the return within the operating life of the timber then owned would be $434 per share. This, computed at the then present worth, was deemed to be at least $200 per share. At the close of 1929, the book value had increased from $125.76 per share in 1924 to $148.88 per share. Annual dividends during that period were declared at eight dollars per share, except for the years 1923 and 1924, when seven dollars was paid. Although this stock was appraised at only $125 *Page 239 
per share by the probate court, the federal government computed it at $148.50 for estate tax purposes, and the tax was levied and paid upon that basis.
The three trustees, during the entire period of administration of the estate and during their trusteeship, have neither asked for nor received any compensation as executors, trustees, or officers or directors of The McCann Company. There has been no enrichment by any of them in any shape or form. They have been dealing honestly with all parties and interests. As stockholders in the company, they have retained, and still retain, their interests, Mr. Carpenter and family having 4,000 shares and Mr. Eames, 384 shares. Fifty shares, costing the latter $175 per share, were acquired in 1929.
The court found that in their every act the trustees had exercised "reasonable diligence, care, skill, and prudence"; that they were not guilty of any negligence; and that, as trustees, they "at all times believed and had good reason to believe" that the stock in the Shevlin-Hixon Company "was and would continue to be a sound, safe, productive, and profitable investment for The McCann Company"; that the "diminution in earning and dividend paying capacity" of the company "was due primarily to the forces set in motion by the depression"; and that less than a year before testator's death, when he created an inter vivos trust for the benefit of his wife and children, he said:
"I advise my Trustees that in my judgment said stock [Shevlin-Hixon Co.] is, and unless conditions change, will remain, a very advantageous investment which ought not to be changed except for substantial reasons."
We have recited, perhaps at too great length, the facts disclosed by this very voluminous record. We have done so for the reason that by viewing the entire record and the surrounding circumstances one cannot help getting a clear picture of testator's wishes. We think there is only one question to be answered: Were the *Page 240 
trustees negligent in their fiduciary duties to the beneficiaries, thus causing them lose?
1. The language chosen and used by testator's competent counsel in drafting the will leaves no doubt that the intention was to invest the trustees with broad discretionary powers in respect to the property coming into their hands. It is our duty to give effect thereto, since "in construing the will the important thing is to ascertain the intention of the testator. All provisions should be harmonized and given meaning if possible." In re Trusteeship Under Will of Jones, 202 Minn. 187,189, 277 N.W. 899, 901; In re Trust of Watland, 211 Minn. 84,91, 300 N.W. 195, 198. The trustees here were selected because testator had complete confidence in their judgment and integrity.
2. While the discretion granted to the trustees was broad and comprehensive, it was not permissible for them to go beyond "sound judgment" and the exercise of "reasonable and prudent discretion." Their duties were fiduciary. In other words, "they were bound to exercise a 'soundness of judgment which follows from a due appreciation of trust responsibility.' " In re Trust of Watland, 211 Minn. 84, 92, 300 N.W. 195, 199.
3. We should not be unmindful of our duty to have in mind that when the creator of a trust intentionally and unmistakably
"reposes a discretion in a trustee, he does so because he desires the honest judgment of the trustee, perhaps even to the exclusion of that of the court. In reposing a discretion he must be held to have known that human judgment is not infallible. It is not for the court to read into a trust instrument provisions which do not expressly appear or which do not arise by implication from the plain meaning of the words used [citing cases], and the court will not substitute its discretion for that of the trustee except when necessary to prevent an abuse of discretion." Dumaine v. Dumaine,301 Mass. 214, 222, 16 N.E.2d 625, 629, 118 A.L.R. 834, 841. *Page 241 
4. This case, unlike that of In re Trust of Watland, involves no breach of faith, no self-enrichment, and no graft or subterfuge. The sole negligence charge upon which the case hinges is whether in retaining the Shevlin-Hixon stock the trustees so acted that we can say, as a matter of law, they were negligent as measured by the standard of fiduciary duty.
"The just and true rule is, that the trustee is bound to employ such diligence and such prudence in the care and management [of the trust estate], as in general, prudent men of discretion and intelligence in such matters, employ in their own like affairs." In re Accounting of Fulton Trust Co.257 N.Y. 132, 136, 177 N.E. 397, 398, 77 A.L.R. 499, 502; In re Trust of Bowden, 194 Minn. 113, 259 N.W. 815; Fortune v. First Trust Co. 200 Minn. 367, 274 N.W. 524, 112 A.L.R. 346.
In the case of In re Trusteeship Under Will of Van Derlip,202 Minn. 206, 207, 277 N.W. 909, we held:
"The words 'securities * * * whether "authorized securities" or otherwise,' as such words are used in * * * said will, are sufficiently broad to include, and do include, corporate stocks, both preferred and common."
Especially helpful is Fairleigh v. Fidelity Nat. B. T. Co.335 Mo. 360, 73 S.W.2d 248.
5. To determine whether the acts of a trustee have been prudent, the court must consider the facts as they existed at the time the acts were performed. This is necessarily so (200 Minn. 379, 274 N.W. 530, 112 A.L.R. 346) "for it is an obvious truth that 'a wisdom developed after an event and having it and its consequences as a source is a standard no man should be judged by' * * * and it is impossible to say that trustees are wanting in sound discretion 'simply because their judgment turned out wrong.' " Helpful, too, is the language of the court in In re Estate of Adriance, 145 Misc. 345, 352,260 N Y S. 173, 181:
"It is entirely true that many financial authorities advocate wide diversity of investment. It is equally true that others strenuously *Page 242 
affirm the contrary, and agree with the familiar admonition of the late Andrew Carnegie: 'Put all your eggs in one basket and watch the basket.' This divergence of sentiment among the financial authorities would render a judicial decision in favor of either school of thought an ultra hazardous undertaking."
North Adams Nat. Bank v. Curtiss, 278 Mass. 471, 180 N.E. 217,83 A.L.R. 607.
6. The findings made by the trial court being well sustained by the evidence, its order is affirmed.