SARAH A. YOUNG v. CHARLES K. BLANDIN AND OTHERS.[1]

April 30, 1943.

No. 33,335.

[1]Reported in 9 N. W. (2d) 313.

See 210 Minn. 346, 298 N. W. 251.

*Oppenheimer, Hodgson, Brown, Donnelly and Baer,* for appellants.

*Patrick J. Ryan,* for respondent.

HENRY M. GALLAGHER, CHIEF JUSTICE.

This suit is in the nature of an accounting. A former trial between the same parties involved many of the same facts. See Young v. St. Paul Publishers, Inc. 210 Minn. 346, 298 N. W. 251, where we held that the correspondence upon which plaintiff relied to sustain an action for breach of contract was insufficient for that purpose. The present cause is based upon the theory that defendant Blandin, a majority stockholder in St. Paul Publishers, Inc. and liquidator of that corporation, made unauthorized investments with part of the proceeds of the sale of the corporate assets, to the loss and damage of plaintiff, a minority stockholder. The trial court made findings of fact and conclusions of law for plaintiff and ordered judgment in her favor for $62,203.07. Defendants moved for amended findings and conclusions or for a new trial and appeal from an order denying that motion.

The events leading up to the sale by defendant St. Paul Publishers, Inc. of the newspapers known as the *St. Paul Dispatch* and the *St. Paul Pioneer Press* to Ridder Bros. and Leo Owens in October 1927 appear in 210 Minn. 346, 298 N. W. 251, and need not be here repeated. At the time of the sale there were outstanding 30,000 shares of corporate stock, of which Charles K. Blandin and the Blandin Development Company owned 28,600 and plaintiff, Sarah A. Young, 900. The remaining 500 shares were owned by various parties and later acquired by Blandin. After

making certain adjustments not here important, the net worth of the company upon completion of the sale was $5,373,221.63, of which $500,000 represented preferred stock in the purchasing corporation and the balance, cash or the equivalent. This sum was subject to the payment of federal income taxes for 1927 assessed by the federal government in 1928 in the amount of $535,000 and settled in 1932 for $151,884.46, and to certain contingent liability of St. Paul Publishers, Inc., as guarantor of payment of bonds issued by Itasca Paper Company, whose stock was owned and controlled by Blandin and the Blandin Development Company, in the approximate amount of $1,500,000. Some of the bonds were retired during each of the years following the sale until 1939, when St. Paul Publishers, Inc. was released in full without any liability having accrued to it.

After the sale Blandin took possession of all the assets of the corporation for the purpose of liquidation. The plan was for him to pay the obligations of the company and distribute the remainder of the assets to the stockholders, less the reasonable and necessary expenses of administration. The corporate structure was left intact for that purpose. Then began the course of activities here involved. The trial court found:

"During the entire time from October 1, 1927, to September 27, 1939, Blandin, as liquidator of the Company, was constantly and actively engaged in buying and selling bonds and stocks with the cash assets of the Company available from time to time for the purpose of making a profit on the rise in the market value of any bond or stock or to minimize or recoup a loss from a fall in the market value of any bond or stock. Many of the bonds purchased were bought at prices substantially below face value. Subsequent to January 1, 1928, Blandin entered upon a policy of investing more and more of the liquidating funds in his hands in corporate stocks. Such investments were not authorized by the articles of incorporation, nor by Miss Young, and were beyond his powers

and in violation of his duties as liquidator. All such investments were non-interest bearing and speculative."

The court detailed in its findings the kinds and amounts of bonds, stocks, and other securities held by Blandin at each of various periods between October 1, 1927, and September 27, 1939, and found that during the time Blandin was in charge of the affairs of the company as liquidator, "he increased the aggregate amount of its investments, including accrued interest on bonds, but excluding cash," in the total sum of $1,529,455.06, and that "there were decreases in the aggregate amount of its investments, including accrued interest, but excluding cash," in the total sum of $3,934,477.53. The net result reflected by the investments was that the decreases exceeded the increases by the sum of $2,405,022.47.

Plaintiff claims that Blandin's investment of the corporate funds was not authorized under the articles of incorporation; that as liquidator he owed a fiduciary duty to plaintiff to distribute the assets of the corporation with reasonable dispatch or to keep them safely until such time as final distribution could properly be made; and that she is entitled to her proportionate share of the net liquidating fund as of October 1927.

Defendant Blandin contends that he was not able to make final distribution until after the federal income tax matter had been settled and until after the corporation's contingent liability as guarantor on the bonds of the Itasca Paper Company had been fully released; that his investment of the corporate funds was authorized and to the best interests of the stockholders; that he exercised due care and caution in choosing and diversifying his investments; that plaintiff was given notice of annual stockholders meetings, and, although she did not attend any of the meetings, she knew or should have known of the investments; that, having accepted dividends representing profits from such investments, she cannot now be heard to say that she did not consent thereto; and that she is barred from asserting this action because of laches.

The trial judge found that Blandin as liquidator made unauthorized investments with the funds of the corporation during the course of liquidation to plaintiff's damage in the sum of $62,-203.07 and that plaintiff was not guilty of laches. He ordered judgment in her favor for the amount of her damage. The only questions presented on the appeal are: (1) Were the investments in question authorized; (2) if unauthorized, is plaintiff barred by laches or estoppel from asserting her claim; and (3) if not, what amount is she entitled to recover? The issue with reference to the legality of the investments is largely one of law. The other issues involve both law and fact.

The articles of incorporation of St. Paul Publishers, Inc. provide:

"The general nature of its business shall be the printing and publishing of a newspaper or newspapers at the City of St. Paul, Minnesota, and at such other place or places as the corporation may deem advisable, and the purchasing, owning and controlling of such rights, franchises and property as may be considered useful and convenient in the business of printing and publication of newspapers, and to this end shall have the right to own and acquire stock in other corporations, or shares of beneficial interest in associations, trusts or joint stock companies. As to any shares so acquired or owned and as to which voting privileges attach, the voting of such shares shall, unless otherwise directed by the Board of Directors of this corporation, be exercised by the president of the corporation."

The quoted article limits the business of the corporation to "the printing and publishing of a newspaper or newspapers" and to "the purchasing, owning and controlling of such rights, franchises and property as may be considered useful and convenient in the business of printing and publication of newspapers." The right to own and acquire stock in other corporations or shares of beneficial interest in associations, trusts, or joint stock companies is restricted to the accomplishment of those purposes.

■ A corporation has only such powers as are expressly granted in its charter or by statute and such implied powers as are necessary and proper for the purpose of carrying out its express powers. 13 Am. Jur., Corporations, p. 770, § 739; 2 Dunnell, Dig. & Supp. § 1998. This general rule as applied to the power of a corporation to invest in securities is embodied in the Minnesota business corporation act, Minn. St. 1941, § 301.10 (Mason St. 1940 Supp. § 7492-9), which permits the acquisition of "shares, bonds, securities, and other evidences of indebtedness of any domestic or foreign corporation when reasonably necessary or incidental to accomplish the purposes stated in its articles." Clearly, the charter of St. Paul Publishers, Inc. does not authorize or permit it to engage in the business of "buying and selling bonds and stocks with the cash assets of the Company available from time to time for the purpose of making a profit on the rise in the market value of any bond or stock or to minimize or to recoup a loss from a fall in the market value of any bond or stock" as found by the trial court, nor may such authority be implied as "reasonably necessary or incidental" to the accomplishment of its named purposes, within the corporation act provision above quoted.

Mr. Blandin, as president, liquidator, and sole director and officer in charge of the corporation's affairs, stood in the position of a fiduciary toward the corporation and the other stockholders. Green v. National A. & A. Co. 137 Minn. 65, 162 N. W. 1056, L. R. A. 1917E, 784; Janney v. Minneapolis Ind. Exposition, 79 Minn. 488, 82 N. W. 984, 50 L. R. A. 273; Taylor v. Mitchell, 80 Minn. 492, 83 N. W. 418; 13 Am. Jur., Corporations, p. 939, § 985. See Pepper v. Litton, 308 U. S. 295, 60 S. Ct. 238, 84 L. ed. 281. He made representations to plaintiff following the sale by letters and reports to her that he was applying every effort to liquidate and distribute the proceeds as soon as possible. That was his primary duty as liquidator. "Liquidation means realization on assets and discharge of liabilities." In re Burger's Estate, 276 Mich. 485, 497, 267 N. W. 887, 891. See also Gibson v. American Ry. Exp. Co. 195 Iowa 1126, 1133, 193 N. W. 274, 278, where the

court defines "liquidation" to mean "the winding up of the affairs of the corporation by reducing its assets, paying its debts and apportioning the profit or loss." Any use of the corporate assets inconsistent with the mere collection of assets, settlement of liabilities, and distribution of the proceeds to the stockholders constituted, in effect, a breach by Blandin of his duty to liquidate and distribute. Whether certain of the investments might be considered wise and prudent or speculative and whether they were made with the care and diligence of an *investor* are therefore immaterial. Fortune v. First Trust Co. 200 Minn. 367, 274 N. W. 524, 112 A. L. R. 346; Helfman v. American L. & T. Co. 121 N. J. Eq. 1, 187 A. 540, and similar cases describing the care required of one whose duty is to make investments, are likewise inapplicable here. It might well be added that the trial court found as facts that Blandin's investments were made for the purpose of realizing gain on the rise and fall of the stock and bond markets and not for the purpose of netting a return on the money; and, further, that the investments were speculative. These findings are sustained by the evidence.

Defendant Blandin contends that he was unable to make final distribution of the assets because of the claim of the federal government for income taxes for the year 1927 and because of the corporation's contingent liability on the bonds of its subsidiary companies. The federal income tax was assessed in the early part of 1928 at $535,000 and settled on February 3, 1932, for $151,-884.46. The retention of a sum equal to or slightly in excess of the maximum amount claimed by the government would have been sufficient. There was no justification for retaining funds for that purpose after the settlement was made in 1932. Plaintiff was not advised of the settlement until 1939.

The corporation was guarantor on bonds of its subsidiary companies in the sum of $1,500,000. It appears that $1,008,000 in bonds were issued by the paper company and power company prior to April 1, 1926. On April 1, 1928, this issue had been reduced to $890,000. On April 1 of each of the following years

to and including 1932, $86,000 was paid, and $91,000 on each of the following years to and including 1938, when the original issue was fully retired. On January 1, 1931, Blandin, through his control of the subsidiary corporations, caused the issue of an additional $492,000 of the bonds of the original authorized issue of $1,500,000, bearing interest at six percent per annum and payable $61,500 on April 1, 1931, and $61,500 on April 1 of each year thereafter to and including 1938. The trial court found that "this act on the part of Blandin was adverse to the interests of the stockholders of the Company and was done without the knowledge or consent of Miss Young." Thus it will be seen that on April 1, 1932, about two months after the settlement of the tax controversy with the federal government, the contingent liability of the corporation on all of the bonds in existence at the time of the sale which it guaranteed had been reduced to $546,000, and, as has been stated, this sum was materially reduced each year thereafter. In the face of this, Blandin retained more than $3,000,000 of the assets of the corporation for about seven more years before making what he claimed to be a final distribution.

Shortly after the sale of the corporate assets, Blandin distributed $2,100,000 in the form of a liquidating dividend, and plaintiff received her share of $63,000. No further distribution was made of the assets until December 1937, when a total of $3,000 was distributed, of which plaintiff received her share of $90. In September 1939 Blandin offered plaintiff her share in the final liquidating dividend in the sum of $24,706.93, which plaintiff accepted, expressly reserving any rights she might have against the defendants for the loss in the value of the shares since 1927.

As liquidator, Blandin was charged with the duty of paying and settling claims against the corporation and distributing the assets. This duty arose out of his position as sole managing officer. Minn. St. 1941, §§ 301.28, 301.31 (Mason St. 1938 Supp. §§ 7492-27, 7492-30). Upon agreeing to sell the assets and to liquidate the corporation and upon his representation that distribution would be made as soon as possible, Blandin became

charged with the duty as the sole director and officer in charge of the corporation's affairs to take such steps and to do such acts as would tend to accomplish that end as expeditiously as possible. His duty was comparable to that of an executor or administrator charged with the responsibility of collecting and distributing the assets to those entitled. See In re Estate of Mellier, 312 Pa. 157, 167 A. 358, 92 A. L. R. 430, Annotation, p. 436. Blandin, like the administrators in Mathews v. Sheehan, 76 Conn. 654, 661, 57 A. 694, 697, 100 A. S. R. 1017, may have "conducted the business of stock speculation in good faith and with ordinary care and prudence. But the law forbade" him "to enter upon * * * that business, and when charged with disobeying the law it is no answer to say that the forbidden thing was done in good faith and with ordinary care and prudence. For loss resulting from this breach of duty" he is "accountable to" plaintiff, "unless the acts which caused the loss were done with" her "consent and allowance."

■ The second question to be determined is whether plaintiff is barred from asserting her cause of action by waiver, laches, or estoppel. It is admitted that she did not attend stockholders meetings which were held every year. And she received dividends out of profits flowing from the unauthorized investments during the first years. It was found as a fact that she did not know that the federal income tax matter had been settled until 1939. Nor did she know the nature of the investments which had been made. Her attorney was informed in 1930 that corporate moneys were invested in various stocks and bonds. It is to be noted that plaintiff at all times here involved owned about three percent of the stock; the rest was owned by Blandin or by companies owned or controlled by him. Blandin had sole charge of the corporation's affairs. Plaintiff was not consulted about any of his activities. The trial court found that plaintiff relied upon Blandin's representations that it would be to the best interests of the stockholders to delay distribution until after settlement of the income tax matter and until final release of the corporation's contingent liability as guarantor on the subsidiary companies' bonds. She made no

independent investigation. Relying upon Blandin's repeated statements that distribution would be had as soon as expedient, plaintiff was not required to take steps to force an earlier distribution. Nor was it incumbent on her to make any objections concerning the amount distributed to her until after final distribution and the rendering of a final account by Blandin.

"The pith of the doctrine of laches is unreasonable delay in enforcing a known right. * * * In a general sense it is such negligence in asserting a right as will bar one from obtaining equitable relief. Whether the delay was culpable or not depends on many circumstances, among which are actual or imputable knowledge of the facts, and resulting prejudice from the delay either to the defendant or to those who have equities to be protected." Briggs v. Buzzell, 164 Minn. 116, 119, 204 N. W. 548, 549.

See also State v. Brooks-Scanlon Lbr. Co. 122 Minn. 400, 142 N. W. 717; Haataja v. Saarenpaa, 118 Minn. 255, 136 N. W. 871; Ekberg v. Swedish-Am. Pub. Co. 114 Minn. 196, 130 N. W. 1029. Where the relationship is one of confidence and a breach of a fiduciary duty has occurred, the evidence should be very convincing before the injured party should be barred. "The application of the doctrine of laches depends largely upon the particular facts and in this case presented a question of fact for the trial court." Keough v. St. Paul Milk Co. 205 Minn. 96, 106, 285 N. W. 809, 816. In the instant case the evidence amply sustains the trial court's finding that plaintiff's conduct did not constitute laches or a waiver of any of her rights. It was further found by the trial court that Blandin represented to plaintiff that he was keeping the money "at interest." Her acceptance of dividends arising out of the unauthorized investments did not, under the circumstances, constitute an estoppel.

The trial court found that the fair net liquidating value of plaintiff's stock on October 3, 1927, was $150,000 and that she had been paid liquidating dividends in the amount of $87,796.93. The court then subtracted this amount from the $150,000 and deter-

mined that "the unauthorized, wrong and unlawful acts of Blandin as liquidator have damaged her in the sum of $62,203.07." Defendants contend that there is no basis in the evidence for that finding of damages. They point out that the net worth of the corporation on October 3, 1927, as found by the trial court, was $5,373,221.63. From that amount must be deducted federal income taxes in the sum of $151,884.46 and $34,000 attorneys' fees paid in connection therewith, leaving $5,187,337.17. Plaintiff's three percent of this would be $155,620.11. Defendants contend that from that amount should be deducted not only the $87,796.93 of liquidating dividends, but also the amounts paid to plaintiffs as dividends out of profits during the years 1927 to 1939, which were paid to her from time to time, in the total sum of $18,900, and her proportionate share of the expenses of administration during those years. It may here be said that expenses incurred by Blandin in the operation of the investment business, including his salary, office expenses, and subscription to various investment services, are clearly not to be proportionately charged against plaintiff's interest, inasmuch as we have herein held that the investment business was entirely unauthorized. In re Estate of Marchildon, 188 Minn. 38, 246 N. W. 676; In re Trusteeship under Will of Rosenfeldt, 185 Minn. 425, 241 N. W. 573; In re Estate of Kline, 280 Pa. 41, 124 A. 280, 32 A. L. R. 926.

The liability of a fiduciary for loss arising out of his unauthorized use of the beneficiaries' funds is well established. 6 Dunnell, Dig. & Supp. § 9939. Equally well settled is the rule that whatever gains accrue through unauthorized use of trust funds belong to the *cestui*. Restatement, Trusts, p. 576, § 210. It would seem to follow that the nonliquidating dividends attributable to gains arising out of Blandin's wrongful investments are therefore not deductible from the amount plaintiff is entitled to receive. See Restatement, Trusts, p. 593, § 213, and *Caveat*, p. 599. We note here that the first nonliquidating dividend paid, of which plaintiff received her share of $9,000, arose out of profits of the corporation before the sale. It also appears that the profits out of

which this dividend was declared were reflected in the determination of the net worth of the company as of October 3, 1927, and should therefore be considered in the same category as liquidating dividends. However, the trial court's award of damages may have been predicated in part, at least, upon what Blandin represented to plaintiff she would receive. The findings show that he represented that her share would amount to $150,000 exclusive of those earnings. They further show that he represented to her that he was keeping the funds "at interest." In determining plaintiff's damages the court did not charge any interest on the moneys retained by defendants during the years Blandin was in charge as liquidator. Interest at two and one-half percent for 11 years would amount to about as much as plaintiff received in nonliquidating dividends. That the court found the fair liquidating value of plaintiff's stock on October 3, 1927, to be $150,000 rather than $155,620.11, as it could have found, is not prejudicial to defendants.

It is to be remembered that this is an action for an accounting, and in such a case the trial court is permitted to apply equitable principles and to mold its relief to meet the particular situation. O'Rourke v. O'Rourke, 130 Minn. 292, 153 N. W. 607; Hoffman Motor Truck Co. v. Erickson, 124 Minn. 279, 144 N. W. 952; Garrey v. Nelson, 185 Minn. 487, 242 N. W. 12. On the whole record, we cannot say that the trial court's assessment of damages is without ample evidentiary support.

Affirmed.